### TERRY STEAM TURBINE CO. v. B. F. STURTEVANT CO.

(District Court, D. Massachusetts. March 13, 1915.)

#### No. 319.

PATENTS ⬡═328—VALIDITY AND INFRINGEMENT—STEAM TURBINE.

The Terry patent, No. 741,385, for a steam turbine, of the type known as a single impulse helical flow turbine, was not anticipated and discloses patentable invention. Claims 1 and 5 also *held* infringed by the devices of the Bentley patents, No. 944,839 and No. 1,042,871, and claim 3 not infringed.

In Equity. Suit by the Terry Steam Turbine Company against the B. F. Sturtevant Company. On final hearing. Decree for complainant. See, also, 204 Fed. 103.

John P. Bartlett and Bartlett, Brownell & Mitchell, all of New York City, and W. K. Richardson, of Boston, Mass., for plaintiff.

Benjamin Phillips, Horace Van Everen, and George E. Stebbins, all of Boston, Mass., for defendant.

BINGHAM, Circuit Judge. The complainant is the owner of United States patents Nos. 741,385 and 793,857, granted to Edward C. Terry on October 13, 1903, and July 4, 1905, respectively; the applications being filed in the Patent Office December 10, 1902, and June 25, 1904. The complainant became the owner of the patents April 10, 1906, by a writing duly executed and recorded in the Patent Office.

This is the ordinary suit in equity, and the defenses are invalidity and noninfringement. Claims 1, 3, and 5 of patent No. 741,385, and claims 8 and 9 of patent No. 793,857, are in issue. Claims 1, 3, and 5 read as follows:

"1. A wheel with substantially U-shaped buckets and reversing chambers arranged mouth to mouth to receive both primary and secondary steam in one and the same bucket, acting at the same time."

"3. A wheel with buckets and reversing chambers of a substantially semi-circular form and with the discharge for the steam therefrom at their central portion, instead of at a circumferential portion."

"5. A wheel having the series of substantially U-shaped buckets and confronting reversing chambers, with the jets in a part of the said reversing chambers and within the mouth thereof, substantially as described."

In the specification of the patent to which these claims relate the patentee declares that he has "invented certain new and useful improvements in steam turbines," and that the objects of his improvements are "simplicity and economy in construction and efficiency in use." The type of turbine here in question is known as a single impulse helical flow turbine. It has a wheel rotating on a shaft $B$ (Figs. 1, 4, and 8 of the patent), and on its periphery a series of overlapping U-shaped buckets, the mouths of which face outwardly around the wheel. They "are arranged in step form, and the axis of their curved walls is neither parallel to the axis of the wheel nor cuts into the said axis." The surrounding casing has a series of reversing chambers of a similar U-shape, with open mouths facing the mouths of the wheel buckets. In the words of the patent:

"These chambers are arranged in a circular series, lapping one upon the other in the form of a series of steps, the plates extending from the inner edge of the rim 23 and plate 15 in direction shown in Figs. 2 and 8, and with the top of the U or broadest part of the semicircular interior of the chambers facing inwardly."

Referring to the feature whereby the receiving ends of each of the reversing chambers is located in a plane at the rear of its discharging end, and, when annexed to or containing a nozzle, to the rear thereof, the patent states:

"Instead of arranging the terminal edge 33 of the plate [of the reversing chamber] that confronts inwardly in a line parallel to the axis of the wheel, I slant the said edge 33, Fig. 6 (also shown by broken lines in Fig. 2), so that the said edge at one of the supporting plates—the plates 15 as shown—is in advance of the same edge where that edge meets the other one, 22, of the plates upon which the said chambers are mounted. This results in giving the broad sides of these chambers a slightly-warped surface. This terminal edge of each chamber at the side from which the jet discharges is in advance of the same edge on that side of the said chamber which receives the steam from the buckets in the wheel by a distance about equal to one-half the space between the two bucket plates measured at the periphery of the wheel."

In the drawings of the patent, the mouths of the wheel buckets are indicated as extending straight across the periphery of the wheel.

"The wheel has a circular series of buckets of a similar construction and form to that of the reversing chambers and also placed with the top of the U or greatest dimension of the semicircle at the edge of the wheel to face the corresponding portion of the reversing chambers, so that when a bucket stops directly in front of one of the reversing chambers they open mouth to mouth

and the two form substantially a circular figure, with a short straight portion on two sides, as best illustrated in Fig. 5."

The steam is discharged into the buckets of the wheel through a divergent nozzle, spoken of in the patent as a jet, inserted through the wall of one of the chambers of a series of four or five.

"The jets 27 are arranged to discharge into the wheel from one of the curved side edges of the reversing chambers."

"The arrangements and number of the jets may vary as circumstances may require. I have shown them as arranged with one jet for every four reversing chambers."

"The jets 27 are in the form of elbow tubes, the small portion of which constitutes the jet proper, while the cylindrical larger body portion connects the jets proper with the steam chamber and gives room for the ordinary pins 28 or other ordinary means for opening and closing the said jets. The delivery end of these jets merges into the adjacent wall of the reversing chambers on what may be termed one leg of the U, considering the chambers U-shaped, as shown in Figs. 2, 5 and 6. In the direction of the width of the reversing chambers—that is, from plate 15 to plate 22—the walls are parallel to make them narrow in this direction, as shown in the said Figs. 2, 5, and 6, while the desired expansion or progressive enlargement toward their effluent end is made by flaring the walls" in the opposite direction.

Another feature of the device relates to crescent-shaped openings for the discharge of dead steam from the reversing chambers and the buckets.

"I have shown the discharge primary into the exhaust-chamber as through the middle or central portion of the broad sides of the reversing chambers in the form of crescent-shaped openings 34; but whether the discharge be through the reversing chambers or through the buckets of the wheel, it will be in the central or middle portion of one of the broad sides."

In speaking of the functions of the reversing chambers, the buckets, and the helical course of the steam, the patentee says:

"I have called the chambers of the case 'reversing chambers,' because that is their primary function, and I may here note that the buckets serve a like function in addition to their bucket function in a wheel. The curve, however, of the buckets and of the reversing chambers and their relations to each other is such that the steam, in passing from one to the other, follows a circular path in one continuous curve without making any reverse curve. In Fig. 5 I have illustrated one of the buckets, 37, 39, as stopped directly in front of one of the reversing chambers, 30, 31, with broken lines and darts to indicate the flow of the steam. If the buckets were held in this position, the steam flowing in at the jet 27 has to travel around, following the curve of the inner wall 39 of the bucket and then the curved wall 31 of the reversing chamber, forming what I may call 'primary' steam. The second time around the steam would gradually widen by expansion and follow around inside of the current of primary steam, forming what I may call 'secondary' steam, and so on until it reaches the outlet 34 in the middle or central portion of chamber, 30, 31, all as indicated in Fig. 5. In practice, however, the buckets are moving; but the steam in flowing from jet to bucket and bucket to chamber, and so on, follows the path shown in Fig. 5, as well as can be illustrated, only, of course, one particular bucket is not all the while in front of any one particular chamber. By means of this form of bucket and chamber placed mouth to mouth for the repeated action of the steam within the same buckets I obtain from a wheel with one series of buckets substantially the repeated use of the steam that is attained by the much more expensive compound wheels."

The art of propelling a wheel by steam is old, but the first two men to produce steam turbines of a practical nature were Parsons and De

Laval. In 1884 Parsons took out a British patent for a reaction pressur-stage turbine. Prior to his invention the principle of reaction due to pressure drop and expansion had been applied to a single stage and a single wheel. This produced unworkable speed. To overcome this, Parsons devised means for applying the principle to a number · of wheels or sets of moving vanes mounted on a shaft. As the steam passed from the high pressure end of the chamber inclosing the movable vanes through the successive sets of vanes to the exhaust, it expanded, decreased in pressure, and imported motion to the vanes. It is this drop in pressure that is the underlying principle of the reaction turbine. By adopting this principle and pressure staging, Parsons reduced the speed of the reaction turbine to practical, workable limits. Its difficulties were its complexity, the necessity of steam-tight casings, the question of clearance of the numerous vanes, and the axial thrust of the shaft, which restricted the application of the principle to turbines of large size. The principle of the reaction turbine is entirely distinct from that employed in the De Laval or Terry turbines, which is that of impulse.

In impulse turbines, the steam is blown against the vanes or buckets of the wheel in the form of a jet, in a manner resembling the impulse given a projectile by the explosion in the barrel of a gun. After the projectile leaves the gun it possesses velocity energy. This is similar to the velocity energy of the steam as it leaves the nozzle of an impulse turbine. The nozzle gives the steam a large velocity at the expense of its pressure energy. In other words, the steam in passing through the nozzle drops in pressure from initial to exhaust pressure and in expanding to the exhaust pressure produces a high velocity. In these turbines the potential energy of the steam is transformed into kinetic energy in the nozzle prior to its entering into the bucket of the wheel, while in reaction turbines the potential energy is transformed into kinetic energy within the wheel. As the motion of the wheel is caused by the impulse of the jet, it follows that the jet speed must be greater than the bucket speed; otherwise, no power will be drawn from the jet by the bucket.

In 1888, De Laval took out a patent in Belgium for an impulse steam turbine, which is conceded to be the first practical commercial turbine of that type. His contribution to the art which insured the success of his machine was in the construction of the steam nozzle, which was divergent beyond the throat and converted all the pressure inherent in the steam into velocity. Prior to his invention converging nozzles were used, and as they developed only a small percentage of the kinetic energy of the steam the impulse turbine was then impractical.

In the De Laval turbine, all the energy of the steam is abstracted by a single jet and is consumed by one passage of the steam through a single series of vanes. In order that the entire energy of the steam be employed, it is necessary that the velocity of the vanes should be equal to about one-half the velocity of the steam jet; and, as the steam velocity obtainable where the steam is discharged into the atmosphere from its ordinary boiler pressure with the divergent nozzle is

about 2,000 feet per second, the vanes must travel at a rate of about 1,000 feet per second, which is faster than the speed of the ordinary bullet. It is apparent from this and other disclosures in the case that when the kinetic energy thus developed is converted into mechanical work, the speed of the wheel is too great for practical purposes, unless a considerable portion of the available energy is wasted. In large wheels the impulse principle, as applied by De Laval, was found to be entirely impracticable, and its use in small ones was prevented, except when accompanied by means for reducing the speed.

In applying this principle to small wheels and to lessen their speed, De Laval resorted to such expedients as speed-reducing gearing and a flexible central shaft. And to further eliminate this difficulty he reduced the velocity of the jet itself before it entered the wheel vanes by mass compounding it with some passive liquid, such as superheated water or other desired fluids, to reduce its acceleration in the nozzle. This last expedient resulted in such a loss of kinetic energy as to amount to a substantial diminution of the power, and the speed-reducing gearing likewise resulted in a loss of the available energy of the steam.

In 1896 Curtis obtained a patent for a multiple pressure-stage compounding-velocity impulse turbine. The object he had in view was the production of an impulse turbine which would work efficiently at a shaft speed so slow as not to require speed reducing gearing and would hold and reserve the potential power of the passing steam until its use was required at a subsequent stage. To do this he devised a scheme of subdividing in the impulse turbine the available energy of the steam, while in transit, into a number of steps or stages. This was brought about by a series of separate wheels on a shaft through the vanes of which the steam was made to pass by employing several successive chambers connected by divergent or parallel nozzles. Instead of developing the full kinetic energy of the steam at one stage upon a single wheel by the use of a single nozzle, he so treated the steam by means of interchamber nozzles that it could be reused in successive nozzles and chambers, with the result that he utilized in stages the full kinetic energy of the steam; and as a result of these subdivision stages of pressure he reduced the steam velocity to a practical bucket speed.

It is thus seen that, while the Curtis turbine was of the impulse type, it did not involve the idea of utilizing the full kinetic energy of a jet of steam on a single wheel by directing it in a helical flow through buckets and reversing chambers, and no contention is made that this invention has any bearing on the patent granted to Terry. Moreover, the defendant's expert admits that on December 10, 1902, when the application for Terry's first patent was filed, "the desirability for some further improvement which would make it practicable to use a simple type of impulse turbine with good economy, yet with a low rim speed, and without pressure staging, was well recognized," and that "these requirements would have been met by turbines like the present Terry turbine or the Sturtevant turbine—that is to say, by a turbine with proper expanding nozzles and with suitably arranged U-shaped reversing chambers placed mouth to mouth with the wheel buckets. But in 1902 no successful turbine of this kind existed."

Prior to Terry's invention, several inventors had undertaken to gradually abstract the velocity of steam through devices calculated to employ it several times, such as surrounding a wheel having a series of buckets or vanes on its periphery with a stationary frame having series or sets of stationary buckets or reversing chambers. The theory upon which the steam was supposed to act when such means were employed was that when driven from the jet or nozzle it would strike a wheel bucket, be carried around the bucket, impelling the wheel in a forward direction, then leave the bucket with a half or three-fourths of its velocity or energy abstracted, pass around a reversing chamber and enter another wheel bucket, and so on, until its energy had been fully abstracted and it had become dead steam. The theory was that if a suitable construction of this kind could be devised, the turbine could be run at a comparatively low speed, and still develop large power by utilizing all the available energy of the steam, and, as above stated, it is admitted by the defendant's expert that the Terry turbine presented means for working out such a result.

Attention has been called to a British patent granted to Imray in 1881, a German patent to Lilienthal in 1890, and a United States patent to Wolke, applied for in April, 1901. All of those patents involved the helical flow idea, but at the time the first two patents were granted the divergent nozzle of De Laval was not known. No reliance is placed upon them as anticipating the Terry patent, and none reasonably could be. The nozzles employed were convergent, and the evidence discloses that in the absence of a divergent nozzle a single stage turbine of the impulse type is wholly impractical. It is the patent granted to Wolke upon which the defendant relies to show anticipation. This patent is now owned by the defendant, it having been procured since the institution of this proceeding.

The Wolke patent discloses a slightly divergent nozzle, the wheel buckets and reversing chambers are U-shaped, and their arrangement with reference to the periphery of the wheel does not differ materially from that in the Terry patent. The drawings of the patent, Fig. 2, indicate that three series or sets of reversing chambers were used, with a nozzle to each set, and that thirteen chambers constitute a series or set. The nozzle which discharges steam into the wheel buckets is located behind each series of chambers. There is no reversing chamber beside the nozzle or to the rear of it; the space at the rear being left open. The main exhaust, according to the specification, seems to be between the clearance of the wheel buckets and the reversing chambers, the edge rings of the rotary being beveled off "to diminish friction and back pressure and facilitate the escape," and the exhaust is "still further facilitated" by the omission of one or more buckets immediately back of each nozzle. The jet discharge from the nozzle is directed towards one side of the rotating wheel buckets, while the discharge ends of both the wheel buckets and the reversing chambers are in advance of their receiving ends, but to what extent is not disclosed.

No turbines were ever constructed under this patent. A model was built by Mr. Wolke in February, 1901, in which one nozzle was used in connection with forty-six reversing chambers. Soon after the com-

pletion of the model it was given a test with compressed air, but what efficiency it disclosed I am unable to gather from the evidence. The plates separating the reversing chambers were afterwards recessed at the center to assist the flow of dead steam to the exhaust, and a deflector was put in behind the nozzle because Wolke thought it might give the steam "on its departure from the guide and wheel buckets" a better chance to escape. In the model (which was a small affair, the diameter being only five inches) the delivery end of the reversing chambers is in advance of the receiving end, but the receiving end is not in the rear of the discharging end of the nozzle, being, if anything, slightly in advance of it. There being no reversing chamber beside the nozzle with its receiving end at the rear of it, a substantial portion of the primary steam, when the nozzle is coincident with the mouth of a wheel bucket, is not returned as secondary steam into the wheel buckets, but is lost. In this respect it differs from Terry's construction in a very important particular. Then, again, the fact that the central portion of the plates in the reversing chambers of the model were recessed to permit the exhaust of the dead steam—a matter not thus provided for in the specification of Wolke's patent—would indicate that the exhaust passages $34$ in the central portion of the plates of the reversing chambers in the Terry device were of special importance, as would also the crescent-shaped recesses in the edges and near the center of the plates of the reversing chambers of defendant's alleged infringing devices, hereafter considered.

Although Wolke's device contemplates the use of a slightly divergent nozzle and the helical flow of the steam, by means of reversing chambers arranged mouth to mouth with the buckets of the wheel, it was without means for properly conserving the steam so that its energy might be fully availed of; and it would seem that no adequate means were provided for eliminating the dead steam from the chambers and buckets—a matter which would materially affect its efficiency. I am therefore unable to find that the Terry patent was anticipated by that of Wolke.

In the construction of turbines under the Terry patent for commercial use the complainant, instead of completely encircling the wheel, has arranged its reversing chambers in a series of four or five chambers to a nozzle, leaving spaces between each series, which operate as an additional exhaust. On this account the defendant contends that the commercial machine constructed by the complainant is not built in accordance with the specification and claims of the patent, and that if the reversing chambers completely encircled the wheel, the apertures $34$ provided for the escape of dead steam from the central portions of the reversing chambers ($34$ in Figs. 2, 5 and 8) would be inadequate and render the turbine impractical.

The primary question, therefore, seems to be whether the specification and claims of the patent should be so limited as to confine complainant to expanding nozzles and suitably arranged reversing chambers entirely surrounding the periphery of the wheel. In the specification, in speaking of the reversing chambers, it is said that "these chambers are arranged in circular series, lapping one upon the other in the

form of a series of steps"; but nowhere does it state that the reversing chambers shall entirely surround and enclose the periphery of the wheel. Such an arrangement might be necessary if all the buckets of the wheel were to be employed at a single instant, and the maximum power of the wheel developed. But it is quite possible that for many purposes the amount of power which would be developed under such an arrangement would not be required. The evidence discloses that a wheel two feet in diameter, in the periphery of which are located some seventy buckets confronted by three sets of reversing chambers, each set containing five chambers and a single jet, will develop 30 horse power, a very substantial power for ordinary purposes; and that when so arranged the greater proportion of the wheel buckets will not be confronted with reversing chambers at any one instant and will be nonactive. Now in view of this and the further facts that the patentee states that his preferred form of arrangement is one jet to four reversing chambers and that the spacing of reversing chambers by omitting one or more at intervals about the periphery of the wheel is an obvious thing and was old in the art, is it not more reasonable to infer that the patentee intended to disclose in his specification a construction which would permit of being used in the above-stated way and as the special requirements for power might demand than that he intended to limit his construction to a series of reversing chambers entirely surrounding the periphery of the wheel? A set or series of four or more reversing chambers, constructed in accordance with the specification, is circular in form and the words employed in the specification—"a circular series of reversing chambers"—do not necessarily confine the construction to a set or series of chambers entirely surrounding the wheel. Furthermore, the patentee expressly states that he does "not wish to be understood as limiting himself to the precise form of construction shown and described" and reserves the right to make some changes therein. And taking the specification as a whole, it seems to me that the patentee is entitled to be protected in the use of the construction employed in his commercial turbine to the extent that the claims of the patent, reasonably construed, may cover such construction and do not call for chambers entirely surrounding the wheel.

It should also be noted that the complainant's expert states that a wheel with reversing chambers constructed in accordance with the specifications of Terry's patent and entirely surrounding the periphery of the wheel, would be practical and efficient. The fact that the commercial wheel has not been so constructed does not necessarily militate against this view, for wheels of this type are small and the amount of power liable to be desired in a majority of cases is readily developed with the means provided by the Terry patent when no more than three to ten sets of reversing chambers are used. Consequently it is as reasonable to believe that turbines have not been constructed with reversing chambers entirely surrounding the periphery of the wheel for commercial purposes because there is no adequate demand for machines developing that amount of power as that when so constructed they would be impractical. I find, therefore, that the contention of the complainant as to this matter is the more reasonable.

Are the claims here in issue, when fairly construed, limited to a construction involving reversing chambers entirely surrounding the wheel? No contention is made that claims 1 and 5 are so limited. The contention of the defendant with reference to claim 1 is that its language does not include a function of complainant's device which differentiates it from the prior art. It is an undeniable fact that in the Terry construction, whenever a wheel bucket is receiving primary steam it also receives secondary steam, while in the Wolke patent this would be true only when the nozzle is straddling the partition between two wheel buckets and discharging primary steam into both of them; and this is so for the reason that in the Terry device there is a chamber with its receiving end back of and contiguous to the discharging end of the nozzle, while in the Wolke patent there is none. As stated by complainant's expert and admitted by the defendant, under the Terry device "each wheel bucket receives both primary and secondary steam acting at the same time, at all times it is receiving primary steam at all." While the language of the claim may be broad enough to include a construction under which secondary steam may at some time be found acting in a bucket with primary steam and does not clearly limit the claim to a construction under which secondary steam is always found acting in a bucket with primary steam, it is evident that when the claim is read with reference to the means specified by Terry to accomplish this result, it was not intended that it should be given the enlarged scope contended for by the defendant, but should be restricted to cover the special function of the patent; and such, I find, is the reasonable construction of the claim.

It may be further stated with reference to this claim, that the term "primary steam," as used therein and explained in the specification, means steam as it is discharged from the nozzle to the bucket, on its first passage through the bucket, and "secondary steam" means steam as it is discharged from reversing chamber to bucket on its second passage through a bucket. If the patentee was mistaken in thinking that the flow of the steam through the bucket was in a layered whirlpool, as the defendant seems to think the specification discloses, that does not alter its character as primary and secondary steam.

As to claim 5, the defendant says that it refers to the location of the jet within the mouths of a part of the reversing chambers, and that the words "in a part of the said reversing chambers" mean in a part of the total number of the reversing chambers, and not in a part of a particular chamber. As to this matter, the complainant is in full accord, for, in the brief of its counsel it is said:

"Our view is that the words 'in a part of the said reversing chambers' mean that the jets are in some, but not all, of those chambers."

And as to the words of the claim, "and in the mouth thereof," the defendant's contention is that the language—

"requires such jet to be actually within the mouth of the reversing chamber, * * * so that the steam passes from the nozzle into and from the mouth of said reversing chamber into the mouth of the wheel bucket, instead of passing directly from the nozzle into the wheel bucket."

222 F.—20

This is manifestly a refinement which the language does not call for. The mouth of a reversing chamber, if no nozzle is inserted, extends from side to side and top to bottom of the chamber, and the nozzle is within the mouth thereof, within the terms of the claim, when it is inserted through the walls of the chamber, and this without regard to whether that portion of the nozzle opposite the side that merges into the wall of the reversing chamber extends all the way or only part of the way to the edge of the advanced plate of the chamber; and the steam is discharged from the jet or nozzle into the wheel bucket, under any reasonable construction of the language, whether that side of the nozzle opposite the one that merges into the side of the reversing chamber extends to the outer edge of the plate as above stated or not. Figs. 7 and 8 of the patent would indicate that the side of the nozzle opposite the side that merges in the side wall of the chamber extends to the edge of the advanced plate. This, however, is entirely immaterial so far as the operation or functioning of the device is concerned, and, so construed, the claim covers the construction described in the specification in the particulars to which it relates.

Claim 3 calls for a "wheel with buckets and reversing chambers of a substantially semicircular form and with the discharge for the steam therefrom at their central portion instead of at a circumferential portion." In construing this claim a dispute has arisen as to what is meant by the words "with the discharge for the steam therefrom at their central portion instead of at a circumferential portion." The defendant regards this language as limiting the claim to a construction where the discharge of the steam from the reversing chambers or buckets is all or substantially all through the crescent-shaped openings *34* located in the central portions of the broad sides of the chambers or buckets, and as excluding a construction which would permit of the discharge of any appreciable amount of steam, as an auxiliary, through the clearance between the wheel buckets and reversing chambers, or from the mouth of a bucket when it is not confronted with a chamber. While in the specification the patentee provides that the primary discharge into the exhaust chamber should be through the crescent-shaped openings *34*, and by the use of the term "primary" indicated that in some forms of his construction he did not mean to preclude himself from making use of an auxiliary discharge, it is evident that a construction affording an auxiliary discharge from the clearance between the buckets and reversing chambers, or from a bucket when not confronted by a reversing chamber, would not give full expression to the language used in claim 3, where it says that the discharge of the steam shall be "at their central portion instead of at a circumferential portion," for steam discharged into the exhaust from the clearance between the buckets and the reversing chambers, or from a bucket when not confronted by a reversing chamber, would be discharged at a circumferential portion rather than at the central portion of the chambers or buckets. In view of this and the fact that the specification also provides for a form of construction in which the wheel would be entirely surrounded by reversing chambers and have a steam-tight chamber to prevent the escape of the steam from the

clearance between the buckets and reversing chambers to the exhaust, it seems to me that the latter is the form of construction contemplated by the claim and that it does not cover a construction which permits the escape of steam from the circumferential portion of the buckets or chambers.

The object in an impulse steam turbine, as in any other steam engine, is the transformation of the steam into mechanical power without loss of energy. This was accomplished in such a marked degree by Terry in a field where prior inventors, in endeavoring to accomplish the same purpose, had failed, that I find there was sufficient invention, in the means employed to bring about the result, to sustain the patent. I am also aided in reaching this conclusion from the position in the commercial world which the Terry turbine took immediately upon its being put upon the market, creating, as it did, a monopoly in the field to which it belonged, and maintaining the same for a period of about six years and down to the time the defendant's alleged infringing device was introduced.

At the time of the institution of this proceeding the defendant was manufacturing and putting upon the market a single wheel helical flow impulse turbine. In its catalogue advertising this turbine, the division plates of the wheel buckets appear to be arranged straight across the periphery of the wheel as in the Terry device. The reversing chambers consist of four chambers to a series. The division plates of the chambers are not arranged diagonally, but the receiving end of each chamber is so constructed as to be slightly in the rear of the discharging end. The nozzle or jet is inserted through the wall of the second chamber and is within the mouth thereof, although the side of the nozzle opposite the side which merges in the wall of the chamber extends to the edge of the advanced plate. In the edge, near the central portion of the plates separating the chambers, there are crescent-shaped recesses, and in the advance plate of the fourth or last chamber there is a deep U-shaped cut. This device is of substantially the same construction as that indicated in Fig. 2, United States patent 944,839, granted to Bentley, December 28, 1909, and which the defendant now owns; the material difference being that in the Bentley device the crescent-shaped recesses in the plates between the chambers and the deep U-shaped cut opening into the exhaust are not present and are not disclosed in the specification of that patent. It is not disputed but that the device performs the same function as that set forth in the first claim of the Terry patent and that whenever the jet discharges steam into the wheel bucket, there will be present in the bucket both primary and secondary steam acting at the same time. I find that this device infringes claim 1 of the Terry patent.

As to the crescent-shaped recesses in the plates between the reversing chambers of this device, the defendant's position is that they are not there for any useful purpose, but were cut by the hub of the milling tool used in recessing the chambers; the chambers being made from a single piece of metal. No reason, however, is advanced by the defendant for the presence of the long U-shaped cut opening to the exhaust through the plate of the fourth chamber. The contention of the com-

plainant is that the crescent-shaped recesses in the central portion of the plates, together with the deep U-shaped cut, furnish means for the escape of the dead steam to the exhaust and perform the same function that openings *34* in the plates of the Terry reversing chambers perform. Complainant's expert says this is their function and that they unquestionably so act as to permit the passage of the dead steam from the chambers to the exhaust. While these recesses were undoubtedly caused by the hub of the tool used in milling the chambers, nevertheless, it appears in defendant's power article of February 20, 1912, that the milling of the chambers can be accomplished by cutters which would not cause the recesses. This fact, taken in connection with the unexplained deep U-shaped cut in the plate of the fourth chamber, leads me to believe that their presence in the defendant's device is for a purpose and that they perform an essential function in the operation of the chambers. But, having construed claim 3 as contemplating a combination or arrangement of means whereby all or substantially all of the steam from the buckets or reversing chambers is discharged into the exhaust through openings in the central portion of the broad sides of the buckets and chambers, and as not permitting the discharge of any substantial part of the steam through their circumferential portion, I am unable to find that the use made by the defendant of the recesses and U-shaped cut in the reversing chambers infringes claim 3, as under its construction and arrangement a substantial part of the steam is discharged from the circumferential portion of the buckets or chambers.

. As above stated, the defendant's first infringing device is of the same construction as that indicated in Fig. 2 of the Bentley patent, No. 944,-839, except as to the crescent-shaped recesses and U-shaped openings, In considering the question whether this device infringes claim 5, I shall refer to Fig. 2 of Bentley's patent. The presence of the first chamber *k*, in the device is necessitated by the fact that the receiving end of the chamber beside the nozzle is not at the rear of the discharging end of the nozzle, and chamber *k* performs the function which a chamber beside the nozzle would perform if its receiving end was at the rear of the discharging end of the nozzle, as in the complainant's device. The insertion of the plate between the chamber containing the nozzle and the chamber back of it produces a mere change in form and, if the plate were omitted, the device would perform the same function. That this is so appears from what Bentley (who is the engineer in charge of the defendant's turbine department) says in his patent No. 944,839, page 2, lines 100 to 109:

"My invention may be somewhat modified without departing from its essential features. For example, the supplemental chamber *k*, instead of being separated from the more advanced chambers by the partition *j*, may be merged therewith as indicated in Fig. 4."

' I therefore find that this device also infringes claim 5 of the Terry patent.

Three months after this suit was begun, the defendant ceased making use of the infringing device heretofore considered and adopted a

modified construction such as is shown in Fig. 2 of United States patent 1,042,871, granted to Bentley October 29, 1912, which patent is now owned by the defendant. This device was introduced into the case by the defendant, and full proofs were offered with reference to it. It has a series of five U-shaped chambers. The first chamber is at the rear and (for all practical purposes) at the side of the nozzle or jet. Its receiving end is also at the rear of the jet and the chamber performs the same function as the one beside the jet in the Terry patent, which has its receiving end similarly situated. This chamber, in connection with the jet, causes the wheel to receive both primary and secondary steam in the same bucket acting at one and the same time, whenever the bucket is receiving primary steam at all. The difference in the construction of the chamber with reference to the nozzle is simply one of form and is brought about by making the plate separating the first chamber from the one immediately in front of it thicker at the discharging side than at the receiving side; the thickness at the discharging side being sufficient to inclose the nozzle. If the thickness of this plate was reduced between the space occupied by the nozzle and the receiving end, the arrangement of the nozzle and chamber would duplicate that of the Terry device. I find that it infringes both claims 1 and 5.

In this device the plates of the chambers in advance of the first chamber slant diagonally, their receiving ends being at the rear of the discharging ends by the width of a bucket. At the center of each of these plates are crescent shaped recesses and a deep U-shaped cut in the last plate, the same as in the previous infringing device, only somewhat larger. I find, however, that it does not infringe claim 3 and for the same reason that the previous device did not infringe.

In view of the conclusions here reached, it does not seem necessary to consider the validity of claims 8 and 9 of United States patent No. 793,857, granted to Terry July 4, 1905, or whether they are infringed by either of the defendant's devices.

There may be a decree for the complainant in accordance with the prayer of the bill.